## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION | ) | |
| 800 K Street, N.W., Suite 1000 | ) | |
| Washington, D.C.  20001 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-3078 |
| | ) | |
| DONALD J. TRUMP, | ) | COMPLAINT FOR |
| President of the United States, | ) | DECLARATORY AND |
| The White House | ) | INJUNCTIVE RELIEF |
| 1600 Pennsylvania Avenue, N.W. | ) | |
| Washington, D.C.  20500 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MICHAEL J. RIGAS, Acting Director, | ) | |
| U.S. Office of Personnel Management | ) | |
| 1900 E Street, N.W. | ) | |
| Washington, D.C. 20415 | ) | |
| | ) | |
| Defendants. | ) | |

_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

Plaintiff National Treasury Employees Union (NTEU) is a labor union that represents approximately 150,000 federal government employees by representing employees in grievances and litigation, negotiating collective bargaining agreements with their agency employers, advocating for legislation that improves the working lives of federal employees, and engaging in general advocacy for federal employees' rights.

On October 21, 2020, Defendant Donald J. Trump issued an executive order that will strip civil service and due process protections from a large swath of federal employees.  Executive Order No. 13957, <u>Creating Schedule F in the Excepted Service</u> (85 Fed. Reg. 67631) (Oct. 21, 2020).  The Executive Order accomplishes this by directing that a broad class of employees be moved into a new excepted service category with no protections against adverse personnel actions.

"The Founders of this Nation entrusted the lawmaking power to the Congress alone . . . ."  <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579, 589 (1952).  This case is a textbook example of the President acting contrary to Congress's express and limited delegation of authority to the President.  Under the law, the President may only except positions from the competitive service when "necessary" and "as conditions of good administration warrant."  5 U.S.C. § 3302.  The President's sweeping Order fails to make a meaningful showing that shifting large numbers of federal employees into a new excepted service category so that they can be fired more quickly and without cause is necessary or supported by good administration principles.  If this Order is allowed to stand, it means that any President can eviscerate the carefully constructed legislative scheme Congress enacted regarding federal service employment.  The Order should be declared *ultra vires* and enjoined.

## JURISDICTION

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

2.     Venue is proper in the District Court for the District of Columbia
       pursuant to 28 U.S.C. § 1391(e).  NTEU is located here.  Defendants
       also reside here, and a substantial part of the events or omissions
       giving rise to the claim occurred in Washington, D.C. because the
       Executive Order was issued here.

<u>**PARTIES**</u>

3.     Plaintiff NTEU is an unincorporated association with its principal
       place of business at 800 K Street, N.W., Suite 1000, Washington, D.C.
       20001.  NTEU is, pursuant to Title VII of the Civil Service Reform Act,
       Public Law No. 95-454, 92 Stat. 1111, the exclusive bargaining
       representative of approximately 150,000 federal employees in 33
       federal departments and agencies.  Many of the employees represented
       by NTEU perform policy-related work.  NTEU represents the interests
       of these employees by enforcing employees' collective and individual
       rights through grievances and federal court litigation; negotiating
       collective bargaining agreements; filing unfair labor practices; and
       advocating in Congress for favorable working conditions, pay, and
       benefits.

4.     NTEU brings this action on behalf of itself because it has been directly
       harmed by the Executive Order.

5.     Defendant Donald J. Trump, in his official capacity as President of the
       United States of America, issued Exec. Order No. 13957.

6.      Defendant Michael J. Rigas is Acting Director of the U.S. Office of

Personnel Management (OPM).  The President has charged OPM and

its Director with implementing Exec. Order No. 13957.  On October 23,

2020, OPM issued a memo to all executive departments and agencies

entitled "Instructions on Implementing Schedule F" which provided

instructions on Exec. Order No. 13957.

https://www.chcoc.gov/content/instructions-implementing-schedule-f

## STATEMENT OF CLAIMS

I.      **The Competitive and Excepted Service Within the Federal Civil Service.**

7.      All civil service employees in the executive branch of the federal

government, with some exceptions such as those in the Senior

Executive Service, are either in the "competitive service" or the

"excepted service."  5 U.S.C. §§ 2102(a)(1), 2103(a); see

generally National Treasury Employees Union v. Horner,  854 F.2d

490, 492 (D.C. Cir. 1988).

8.      Applicants for employment in the competitive service must go through

a competitive process (i.e., competitive examining).

https://www.opm.gov/policy-data-oversight/hiring-

information/competitive-hiring/; 5 C.F.R. Part 337.

9.      Applicants for excepted service positions, like applicants for the

competitive service, are to be selected "solely on the basis of relative

ability, knowledge, and skills, after fair and open competition which

4

assures that all receive equal opportunity," 5 U.S.C. § 2301(b)(1), but they are "excepted" from competitive service requirements, such as taking a competitive examination.

10.  By statute, competitive service employees receive a number of protections not enjoyed by those in the excepted service.  See <u>Allen v. Heckler</u>, 780 F.2d 64, 65 (D.C. Cir. 1985).  For example, excepted service employees do not have the same rights as competitive service employees to have their seniority considered when they apply for competitive positions and to "bump" employees with less seniority in the event of a reduction in force.  See 5 C.F.R. §§ 351.501-351.502.

11.  Congress authorized the President, when warranted by "conditions of good administration," to make "necessary exceptions of positions from the competitive service" within the executive branch.  5 U.S.C. § 3302.

12.  OPM has, prior to the Executive Order challenged here, divided excepted service positions into five categories: Schedules A, B, C, D and E.  5 C.F.R. § 6.2.

## II.   The President's Executive Order.

13.  President Trump issued Executive Order No. 13957, <u>Creating Schedule F in the Excepted Service</u> (85 Fed. Reg. 67631) on October 21, 2020.

14.  The Order creates a new Schedule F at 5 C.F.R. § 6.2 to put in the excepted service "[p]ositions of a confidential, policy-determining,

policy-making, or policy-advocating character not normally subject to change as a result of a Presidential transition."  Exec. Order No. 13957, §§ 3, 4.

15. The Order states that an exception to hiring rules is necessary because agency heads need "additional flexibility to assess prospective appointees without the limitations imposed by competitive service selection procedures" and need "greater ability and discretion to assess critical qualities in applicants to fill these positions, such as work ethic, judgment, and ability to meet the particular needs of the agency."  Exec. Order No. 13957, § 1.

16. Although the Order states that it is "necessary," the Order provides no details, data, or explanation for why competitive service selection procedures have impeded hiring of needed federal positions.  Exec. Order No. 13957, § 1.

17. The Order also exempts "such positions" from the "adverse action procedures set forth in chapter 75 of title 5, United States Code. Chapter 75 of title 5."  Exec. Order No. 13957, § 1.

18. The Order justified exempting such positions from these adverse action protections by asserting that "removing poorly performing employees [can be] difficult" and agencies "need the flexibility to expeditiously remove poorly performing employees from these positions without facing extensive delays or litigation."  Exec. Order No. 13957, § 1.

19.   Although the Order states that removing positions from adverse action protections is "necessary," it provides no details, data, or justification for this change to removal procedures.  It asserts only generalities such as "[s]enior agency officials report that poor performance by career employees in policy-relevant positions has resulted in long delays and substandard-quality work for important agency projects, such as drafting and issuing regulations."  Exec. Order No. 13957, § 1.

20.   The Order also directs the OPM director to "adopt such regulations as the Director determines may be necessary to implement this order" and to "provide guidance on conducting a swift, orderly transition from existing appointment processes" for the new Schedule F employees.  Exec. Order No. 13957, § 4(b).  OPM issued guidance on October 23, 2020.

21.   The Executive Order also directs each executive agency head to "conduct, within 90 days of the date of this order, a preliminary review of agency positions covered by subchapter II of chapter 75 of title 5, United States Code, and [to] conduct a complete review of such positions within 210 days of the date of this order."  Exec. Order No. 13957, § 5.

22.   When conducting these reviews, the Executive Order instructs agency heads to "give particular consideration" to shifting to Schedule F positions whose duties include:

7

(i) substantive participation in the advocacy for or development or formulation of policy, especially:

(A)  substantive participation in the development or drafting of regulations and guidance; or

(B)  substantive policy-related work in an agency or agency component that primarily focuses on policy;

(ii) the supervision of attorneys;

(iii) substantial discretion to determine the manner in which the agency exercises functions committed to the agency by law;

(iv) viewing, circulating, or otherwise working with proposed regulations, guidance, executive orders, or other non-public policy proposals or deliberations generally covered by deliberative process privilege and either:

(A) directly reporting to or regularly working with an individual appointed by either the President or an agency head who is paid at a rate not less than that earned by employees at Grade 13 of the General Schedule; or

(C) working in the agency or agency component executive secretariat (or equivalent); or

(v) conducting, on the agency's behalf, collective bargaining negotiations under chapter 71 of title 5, United States Code.

Exec. Order No. 13957, § 5(c).

23.   Following such reviews, each agency head shall petition the OPM

Director for positions that are "confidential, policy-determining, policy-

making, or policy-advocating character and that are not normally

subject to change as a result of a Presidential transition" to move such

positions from the competitive service or from Schedules A, B, or D

positions into the new Schedule F.  Exec. Order No. 13957, § 5(a)(i).

8

24. The Order states that it "shall apply to currently existing positions and newly created positions." Exec. Order No. 13957, § 5(b).

25. The Order also directs agency heads, "as necessary and appropriate," to "expeditiously petition the Federal Labor Relations Authority to determine whether any Schedule F position must be excluded from a collective bargaining unit." Exec. Order No. 13957, § 5(e).

### III. The Harm that NTEU Will Suffer Due to the Executive Order.

26. NTEU brings this action on behalf of itself because the Executive Order is harming NTEU by requiring it to spend time and resources in order to counteract the Order.

27. The present day competitive civil service dates back more than 130 years to the Pendleton Civil Service Reform Act which eliminated the spoils system and established a merit-based, competitive system for the appointment of federal employees.

28. The Executive Order will radically reshape the civil service by drastically increasing the number and type of employees who are subject to dismissal without adverse action rights.

29. The Executive Order by its terms will not just apply to employees hired in the future, but will also apply to employees who have already been hired into the competitive service or into previously existing excepted service categories. These incumbent employees accepted their jobs with the expectation that they had the civil service and due

process protections attendant to their appointment.  They will now be involuntarily moved to the new Schedule F and stripped of those protections.

30.    The radical change that this Executive Order will effect has been widely recognized.  The Executive Order has been described "as a 'stunning' attempt to politicize the civil service and undermine more than a century of laws aimed at preventing corruption and cronyism in the federal government."  Wagner, Erich, "Stunning" Executive Order Would Politicize Civil Service, (Oct. 22, 2020), govexec.com (https://www.govexec.com/management/2020/10/stunning-executive-order-would-politicize-civil-service/169479/.

31.     "[I]f all decision makers in the federal government were to turn over every four or eight years [. . . t]hat would make the government more like the cast of *Game of Thrones*."  Lee, Bruce, Trump's New Executive Order May Make it Easier to Fire Scientists Like Fauci, forbes.com (Oct. 24, 2020). (https://www.forbes.com/sites/brucelee/2020/10/24/trump-new-executive-order-may-make-it-easier-to-fire-scientists-like-fauci/#42741e42520)

32.    The Executive Order gives the President "the power to mount a scorched-earth campaign" and gives him "largely unfettered authority

to fire experts like Dr. Anthony Fauci while leaving behind a corps of

embedded loyalists to undermine his successor."  Feinberg, Andrew,

<u>Trump Just Quietly Passed an Executive Order that Could Destroy a</u>

<u>Future Biden Administration</u>, theindependent.co.uk (Oct. 23, 2020)

(<u>https://www.independent.co.uk/voices/trump-executive-order-civil-</u>

<u>service-biden-election-schedule-f-b1255692.html</u>).

33.   NTEU represents many employees who perform policy-related work.

Stripping these employees of their civil service and due process

protections is at loggerheads with NTEU's mission "to ensure that

every federal employee is treated with dignity and respect."  A critical

part of that mission is to protect these employees from arbitrary

treatment.

34.   NTEU is now needing to expend scarce time and resources to evaluate

how the Order will affect its operations and the employees it

represents.

35.   NTEU's legislative staff is assessing the Order, evaluating whether

there is any legislative action that can be taken to address it, and

communicating with Members of Congress and their staffs.  Senior

staff, including the NTEU Legislative and Political Director and

Deputy Legislative Director, are working on a strategy to mitigate the

impact of the Order on NTEU.  This entails, *inter alia*, talking with

staff on the Financial Services and General Government

Appropriations Subcommittee regarding the possible insertion of language in an appropriations bill to prohibit the use of funds to implement the Order.  NTEU staff needs to provide legislative language and, in any event, consults with members on the final language of the bill.

36.    NTEU's Legislation Department will also perform outreach to Congressional staff to build support for that legislative language, including communications with staff for appropriations, authorizing and oversight committees; Congressional leadership; offices of members of Congress whose states and districts contain large numbers of federal employees; and other interested members of Congress.

37.    In addition to these direct actions, which are already occurring, the NTEU Legislative Director and Deputy Director have seen increased inquiries from Hill staff regarding the impact of the Order on NTEU-represented members.  They have set up and prepared for multiple calls in the last four days, including calls between NTEU National President Anthony Reardon and Members of Congress.

38.    Going forward, the Legislation Department will spend additional time and resources on educating Congress about the adverse effects of this Order.  That includes writing letters to Members of Congress in support of including the above-mentioned appropriations language in a

pending bill, as well as encouraging our own members to write letters to Members of Congress.

39.    Senior staff in NTEU's Office of Field Operations are also assessing the Order to evaluate which employees represented by NTEU perform policy-related work and evaluating how best to protect these employees' due process rights.  Given the extraordinarily broad definitions contained with the Executive Order, significant time and resources will be spent on this task.  This includes contacting local chapter leaders to discuss with them individual member duties and reviewing potentially hundreds of agency-specific position descriptions. This assessment, moreover, must be done agency by agency, department by department, job series by job series because of the Order's instructions for agencies to identify all currently existing and newly created positions to be converted to Schedule F.

40.    NTEU's senior field operations staff is also evaluating how it will respond when agencies act on the President's directive to "expeditiously petition" the FLRA to determine whether any Schedule F employees should be excluded from a collective bargaining unit. Such determinations must be made on the basis of an individual employee's assigned duties, not the employee's position description. Each such proceeding will be a fact-intensive proceeding that will explore the duties of each position involved.  These proceedings may

involve written argument or oral testimony or both. The Order's command to send numerous petitions to the FLRA will result in a substantial expenditure of NTEU time and resources.

41.     Finally, as noted, NTEU represents 150,000 federal employees in 33 departments and agencies across the federal government. NTEU has litigated key issues concerning the civil service, including litigating First Amendment, due process, and other constitutional rights. As experts in this field, it will be the Union where members, the media and the public turn for help in understanding the broad scope of this Order. NTEU has been, and will continue to be, called on to explain the nuances of the Order and its adverse effects on the federal civil service. As part of that effort, NTEU's Public Relations Department must create fact sheets, draft press releases, tape videos for internal member and public consumption, and provide online educational resources.

42.     Working on counteracting the injury from the Executive Order in all these ways is diverting and will continue to divert NTEU staff from work it would otherwise be doing to represent employees, negotiate with agencies, and advocate to Congress on employees' behalf.

### CAUSES OF ACTION

<u>Count 1</u>:  The President's Executive Order is unlawful and ultra vires because it is not necessary for good administration.

14

43.   Plaintiff reasserts the allegations contained in paragraphs 1 through 42 of this complaint as though contained herein.

44.   Courts have jurisdiction to grant relief when the President acts beyond the scope of his authority and violates the law, to the injury of an individual or organization.

45.   Congress gave the President limited authority to prescribe rules for the competitive service but expressly cabined that authority by stating that any exceptions from the competitive service must be "necessary" and "as nearly as conditions of good administration warrant."  5 U.S.C. § 3302.

46.   The Executive Order is not necessary nor is it warranted by conditions of good administration as required by 5 U.S.C. § 3302.  The Order is supported by only the broadest generalities about the need to hire employees more readily and fire them more quickly.

## REQUEST FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff NTEU requests judgment against Defendant President Donald J. Trump and OPM Director Michael J. Rigas:

A.   Declaring that the Executive Order 13957 is unlawful.

B.   Enjoining Defendant Director Rigas from implementing or enforcing Executive Order 13957.

C.   Enjoining OPM from implementing Executive Order 13957.

D.   Awarding Plaintiff reasonable attorney fees and costs incurred.

15

E.     Ordering such further relief as the Court may deem just and appropriate.

Respectfully submitted,

 /s/  Gregory O'Duden
GREGORY O'DUDEN (D.C. Bar 254862)
General Counsel

 /s/  Julie M. Wilson
JULIE M. WILSON (D.C. Bar 482946)
Deputy General Counsel

 /s/  Paras N. Shah
 PARAS N. SHAH (D.C. Bar 983881)
 Assistant Counsel

 /s/  Allison C. Giles
 ALLISON C. GILES (D.C. Bar 439705)
 Assistant Counsel

NATIONAL TREASURY EMPLOYEES UNION
800 K Street, N.W., Suite 1000
Washington, D.C.  20001
Tel:  (202) 572-5500
Fax:  (202) 572-5645
Email:  greg.oduden@nteu.org
Email:  Julie.m.wilson@nteu.org
Email:  paras.shah@nteu.org
Email:  allie.giles@nteu.org

October 26, 2020          Attorneys for Plaintiff